IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Genesis Telecommunications, LLC,  )<br>  )<br>                    Plaintiff, )<br>  )<br>         vs. )<br>  )<br>Dearyl W. Moore, Jr., Priority )<br>Information Technology, Inc., and )<br>Embarq Communications, Inc., )<br>  )<br>                Defendants. ) | Civil Action No.: 8:08-1715-JMC-BHH<br><br>**REPORT AND RECOMMENDATION<br>OF MAGISTRATE JUDGE** |

This matter is before the Court on the defendant Embarq Communications' (hereinafter the "defendant" unless otherwise distinguished more specifically from other defendants in this case) motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. [Doc 154.] The plaintiff contends that the defendant tortiously interfered with a total of twenty-six contracts between the plaintiff and its customers for telephone and internet service.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters involving litigation by individuals proceeding *pro se* are referred to a United States Magistrate Judge for consideration. Defendant Dearyl W. Moore, Jr., is *pro se.*

## FACTUAL BACKGROUND

The plaintiff sells telephone and internet service and also provides computer services in the Greenwood area. Pursuant to the Federal Telecommunications Act of 1996, the defendant is a competitive local exchanged carrier (CLEC), which means that it is authorized under the Act to purchase access to telecommunications services from the incumbent local exchange carrier (ILEC) at tariffed rates and then resell such services to the public. It is represented that United Telephone Company of the Carolinas LLC ("UTC"), which formerly operated under the trade name Embarq, is the ILEC in Greenwood. Embarq and UTC are wholly owned subsidiaries of the same parent corporation. Lee Canipe and

Dayne Pruitt are the Embarq sales personnel who allegedly interfered with the plaintiff's customer relationships on behalf of the defendant Embarq. It is further represented that Canipe and Pruitt sell the defendant branded services on behalf of both UTC and ECI.

In July 2005, a Dearyl Moore and two other employees of the plaintiff decided to leave the plaintiff's employ and form a new company, Priority IT, which is also a defendant in this case. (Moore Dep. at 35, 40.) In all, it is proffered that 5 individuals – Dearyl Moore, Brian Carroll, Brian Dean, Brian Kneece, and Florence Canfield – were prior employees of the plaintiff who eventually left their employment with the same only to take jobs with competitors or customers of the plaintiff. It is represented that Priority offered computer technician services but was not a telecommunications provider. Defendants Priority and Embarq entered into a short-term partnership agreement whereby Priority was paid a commission for referring customers to the defendant. (Canipe Dep. at 23, 25, 43-44; Pl. Ex. B.) That arrangement ended on April 13, 2007. (Escobar Decl. ¶ 3.) The plaintiff contends that the partnership agreement was, in fact, Embarq's authorization to Priority that it should initiate an aggressive strategy of recruiting new customers, particularly those already under contract with the plaintiff.

In June 2007, after termination of the arrangement between Priority and Embarq, the previously identified Brian Carroll was fired by the plaintiff, and also went to work for Priority as an independent contractor in the area of computer network repair. (Carroll Dep. at 9-10.) Some of Priority's computer services customers, including Lakeland Orthopedic, asked Carroll about helping them switch their telecommunication services from Genesis to Embarq. (Carroll Dep. at 25, 76, 102 & Ex. 1 at 10-11). Ultimately, roughly 26 former customers of Genesis switched their service from the plaintiff to Defendant Embarq. (30(b)(6) Dep. at 112-13 & Ex. 1.) Among others, the 26 customers include 6 entities, which will be collectively referred to as the Piedmont Health Group (PHG).

2

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

**I. Habit Evidence Regarding Various Customers**

As an initial matter, the plaintiff has not met its Rule 56 burden to create issues of fact as to 19 of the 26 customers at issue in this case. *See* Fed. R. Civ. P. 56. In its response, the plaintiff focused exclusively on whether there was evidence of tortious interference by the defendants in regards to only seven of the plaintiff's customers, Lakeland Orthopedic and the six Piedmont Health Group entities. The plaintiff offers no specific evidence as to the circumstances or details related to contracts with other customers; the defendant's conduct directed towards those customers; or the consequences or damages resulting from the same. (See Pl. Resp. at 14-15.) Rather, the plaintiff contends that summary judgment should be denied as to allegations concerning the other 16[1] customers because Rule 406 of the Federal Rules of Civil Procedure allows the plaintiff to rely on the alleged pattern of deceitful behavior and interference directed towards

---

[1] The plaintiff has abandoned its claims as to McCravy Newlon Law Firm, Greenwood Municipal Federal Credit Union, and Wingard's Pharmacy.

Lakeland Orthopedic and PHG, as evidence of similar conduct in regards to the other 16 customers.

Rule 406 states:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eye witnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Fed. R. Evid. 406.

A habit is a regular practice of meeting a particular situation with a specific type of conduct, "'such as the habit of going down a particular stairway two stairs at a time, or of giving a hand-signal for a left turn, or of a lighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.'" *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1232 (10th Cir. 2001) (quoting *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.1987) (quoting Fed. R. Evid. 406 advisory committee notes)). The touchstone of Rule 406 is nonvolitionality. *See Eason v. Fleming Companies, Inc.*, 1993 WL 360736, at *6 (5th Cir. August 24, 1993). "[H]abit refers to the type of nonvolitional activity that occurs with invariable regularity. It is the nonvolitional character of habit evidence that makes it probative." *Weil v. Seltzer*, 873 F.2d 1453, 1460 (D.C. Cir.1989).

Critically, Rule 406 demands that habit or pattern evidence be both specific and that it speak of regular and repetitive conduct. *Simplex, Inc. v. Diversified Energy Systems, Inc.*, 847 F.2d 1290, 1294 (7th Cir. 1988). Here, interactions with various customers are by, their very nature, diversified, nuanced, and variabled exchanges. They are not of the kind of conduct "capable of almost identical repetition." *Id*. Moreover, the plaintiff has offered only two instances of such conduct. Courts have rejected that even "[f]ive incidents ordinarily would be insufficient to establish the existence of a habit." *Perrin v. Anderson*, 784 F.2d 1040, 1046 (10th Cir.1986). Two incidents is abjectly insufficient. *See Eason v. Fleming Companies, Inc.*, 1993 WL 360736, at *6 (5th Cir. August 24, 1993). Interaction with unique

5

and differing customers is simply too variant and individualized an event to qualify as the kind of specific circumstance from which habit can be inferred. Even to the extent it is not too non-specific, the plaintiff has failed to produce evidence of the kind of regularity necessary to invoke Rule 406's benefit. The plaintiff would beg to prove up 16 circumstances of alleged wrong, on the strength of two. This goes too far. *See Simplex*, 847 F.2d at 1294 ("[T]he Rule 406 inquiry also necessitates some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place." (quotations omitted).)

## II. Tortious Interference with Contract

As stated, the plaintiff contends that the defendant has intentionally interfered with the contractual relationship it had with various customers. Based on the Court's recommendation, *supra*, only the defendant's actions regarding customers of the plaintiff, Lakeland Orthopedic and PHG, need to be considered. Under South Carolina law, to establish a claim for tortious interference with contract, the plaintiff must prove: (1) the existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages." *Camp v. Springs Mortgage Corp.*, 426 S.E.2d 304, 305 (1993). As the defendant contends, element three requires proof both of a breach of the underlying contract by the customer and an intentional procurement of that breach by the defendant. *See First Union Mortgage Corp. v. Thomas*, 451 S.E.2d 907, 913 (S.C. Ct. App. 1995) ("Without a breach of the underlying contract, there can be no recovery.")

The record in this case is not without inflammatory evidence. The plaintiff has submitted certain emails which speak not only to the presence of mal intended business practices but to deplorable and discriminatory personal beliefs expressed in the context of the same. That being said, the record in general does not rise to meet the technical

6

demands of the legal elements of the claim. The Court will address the circumstances related to each customer in turn.

### A. Lakelands Orthopedic

The defendant principally argues[2] that plaintiff's claim as to Lakelands Orthopedic fails on two elements: (1) intentional procurement of the breach by the defendant and (2) an absence of justification for the breach. The Court need only address the former.

#### 1. Intentional Procurement

There is substantial evidence of an aggressive, albeit generalized, campaign to intentionally steal customers of the plaintiff for the very purpose of putting it out of business. Brian Kneece, a former employee of defendant Priority, expressly testified that such was the goal:

> Q. Were you ever instructed by Brian Carroll or Dwayne Moore on how to recruit potential customers?
>
> A. Yes.
>
> Q. And what were their instructions?
>
> A. In order to give an honest answer I have to say things that I regret having to say, but -- because I just don't like the way it was presented, but I had heard Brian Carroll **say on a regular basis that his goal was to put Genesis out of business and based on several other statements that he believed -- that he stated, based on several other things he said, his intention was to target Genesis customers.**

( Kneece Dep. at 36 (emphasis added).)

In the process of predatorializing these clients, Brian Carroll would especially and intentionally disparage the plaintiff and Ken Jefferson, its founder and manager:

> Q. Now, while you were with Priority IT, your relationship with Ken Jefferson was still on the rocks; is that right?
>
> A. Yes.

---

[2] Although not said directly, the defendant seems to narrow its argument to simply the elements of intentional procurement and absence of justification, in its Reply. (Reply at 5.)

7

> Q. And you had spoken with Mr. Moore about approaching Genesis' clients for their business; is that correct?
>
> A. Yes.
>
> Q. When you approached these various clients, did you ever -- do you ever recall making disparaging comments about Mr. Jefferson or Genesis Telecommunications?
>
> A. Yes.
>
> Q. Was that, in part, because of your disagreeable relationship that you had with Mr. Jefferson?
>
> A. Yes.
>
> Q. Do you remember what type of comments you would make about his business?
>
> A. They suck; they don't know what they're doing; Ken's an ass.

(Carroll Dep. at 25-26.)

These sentiments and worse were communicated *directly* to Lakelands in an attempt to woo its business:

> They don't pay the bills (they can't) they give rotten service, ken is an ass and liar and cheat (so is John) and they breached their contract. He has also signed a contract with Embarq . . . .

(Pl. Ex. G.)

> He knows what Embarq wants they have left him 10000000000000 messages. He is just trying to save the account still. Tell Jim to call him a faggot and release the CSR. What is up with my check homey?

(Pl. Ex. G.)

> Looks like something that crippled fucking cokehead worm would do with his faggott john loving buddy Rolando. Fucking Venezuelans.

(Pl. Ex. G.)

> Tomorrows [sic] word of the day "ken Jefferson" a the worst curse word that can EVER be uttered by anyone
>
> Friday's – Boo-crap – meaning nigger shit.

(Pl. Ex. G.)

8

> That is some nigger shit, defiantly a Lawrence.

(Pl. Ex. G.)

To the Court, this evidence creates at least some issue of fact as to whether or not there was intentional procurement – to wit, a solicitation of Lakeland's business. Whatever evidence and argument the defendant has proffered that Lakeland, in fact, initiated contact with the defendant, (see Def. Mem. Supp. Summ. J. at 8; Def. Reply at 9; Pruitt Dep. at 57-60), in response, only cements a factual dispute, which the Court cannot resolve. A reasonable jury could disagree over whether the transfer of services was initiated by Lakelands or solicited by Carroll *et al.* The evidence speaks of an individual, in Carroll, highly motivated to rob the plaintiff of clients. A jury could believe those circumstances predominated over any evidence that Lakeland, itself, asked Carroll about helping switch its telecommunication services from Genesis to Embarq, a view emphasized by the defendant. (Carroll dep. at 25, 76, 102 & Ex. 1 at 10-11.) The Court certainly cannot decide it.

Instead, the pivotal issue is one of agency. Can the defendant be held to account for actions taken by Brian Carroll, an independent contractor, not actually of the defendant but of the defendant's former business associate? The relation is tenuous. Agency can be established in various ways. The most common are proof of actual agency or apparent agency. The latter need not be considered here, because the plaintiff does not argue it.

To determine whether an actual agency relationship exists, the "decisive test" is "whether the purported master has the right or power to direct and control the servant in the performance of his work and in the manner in which the work is to be done." *Jamison v. Morris*, 684 S.E.2d 168, 171 (S.C. 2009); *see also Fernander v. Thigpen*, 293 S.E.2d 424, 426 (S.C. 1982) ("The test to determine agency is whether or not the purported principal has the right to control the conduct of his alleged agent."); *Young v. Warr*, 165 S.E.2d 797, 802 (S.C. 1969) ("The general test applied is . . . whether there exists the right and authority to control and direct the particular work or undertaking, as to the manner or means of its accomplishment."); *DeBerry v. Coker Freight Lines*, 108 S.E.2d 114, 116 (1959) ("The right

or power of control retained by the person for whom the work is being done is uniformly regarded as the essential criterion for determining whether the workman is an employee. . . ."). "In an actual agency case, the question is not whether the purported principal could have exercised control over its agent, but whether it did so." *Id*. Critically, agency may be implied or inferred and may be circumstantially proved by the conduct of the purported agent exhibiting a pretense of authority with the knowledge of the alleged principal. *See Fernander v. Thigpen*, 293 S.E.2d 424, 426 (S.C.1982).

It would be an understatement to say that the record is almost entirely devoid of probative evidence on this point – the defendant's ability to control Carroll. As far as the Court can tell, there is no direct evidence that the defendant either was controlling, or ever could have controlled, the actions of Carroll. Carroll was not an employee of the defendant. This fact, of course, is not dispositive; independent contractors may also be actual agents. "The fact that someone is employed as an independent contractor does not negate the fact that he may be acting as an agent." *M.B. Kahn Constr. Co., Inc. v. Three Rivers Bank & Trust Co.*, 581 S.E.2d 481 (2003); *see also Nelson v. Yellow Cab Co.*, 564 S.E.2d 110 (2002) *overruled on other grounds by Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.*, 676 S.E.2d 700 (S.C. 2009); *Love v. Gamble*, 448 S.E.2d 876, 808 (S.C. Ct. App. 1994); *Palmer & Cay/Carswell, Inc. v. Condo./Apartment Ins. Serv. Inc.*, 409 S.E.2d 806, 808 (S.C. Ct. App. 1991). But, neither was he an independent contractor of the defendant. At best, the evidence indicates that Carroll was the independent contractor of *Defendant Priority*. (Carroll Dep. at 9-10.)

Defendant Priority, however, at the time of Carroll's association to it, had no contractual relationship with Defendant Embarq. The agreement between those two entities was terminated on April 13, 2007 – two months prior to Carroll going to work for Priority in June 2007. (Escobar Decl. ¶ 3; Carroll Dep. at 9-10.) The plaintiff has not offered any evidence of the rehabilitation of that agreement.

In truth, the Court does not know how it could possibly construe Carroll as the defendant's agent. The undersigned has certainly been motivated to credit the evidence

as far as it will go in this regard, considering the extreme testimony present in this case revealing, if believed, Carroll's unfortunate and plain vitriol. Without citation, however, the plaintiff would contend that the agency relationship may simply be inferred from "the conduct of both Embarq and Carroll" and from the fact that "Carroll arranged and attended the initial meeting between Embarq and Lakelands [sic]." (Pl. Resp. at 10.) The plaintiff summarily states that "Carroll then followed up with Lakelands [sic] until the change to Embarq was cemented." *Id.* The plaintiff has acted as though the centrally disputed fact is a foregone one – Carroll surely must have been an agent of the defendant. But the plaintiff somehow confuses Carroll's indisputable participation in the business negotiations with actual *agency*.

As discussed, this is a legal term of art that denotes a particular kind of relationship, namely, one in which the actions of a party may be dictated by the demands of another. The fact that Carroll acted as some sort of intermediary says essentially nothing about Defendant Embarq's "control" over him. There is not a single piece of evidence, circumstantial or direct, that indicates that Carroll was, or ever could have been, controlled by the defendant. Agency law guards against the unqualified injustice of holding defendants accountable for actions not of their own design or over which they had no influence. In a perfect case, the plaintiff could recover its loss from Carroll and Priority directly, whose culpability seems most clear and direct. For numerous reasons, full and reasonable monetary remedy from either is dubious, and Defendant Embarq obviously represents a better source of recovery. But, as a former and plainly bitter employee of the plaintiff, Carroll's conduct and words actually speak of motivation quite independent of Defendant Embarq or any of its business aims or instructions. None of the evidence related to his conduct suggests that he was aggressive at the provocation of the defendant or even with its financial benefit in mind. Rather, he was focused exclusively on something akin to vengeance, if the emails are to be believed. When asked if his pursuit of customers was motivated "in part, because of [his] disagreeable relationship that you had with Mr. Jefferson," he answered, "Yes." (Carroll Dep. at 25-26.) Carroll repeatedly and

unabashedly professed personal vindication as his muse. The Court must stand as a gatekeeper against misapplied blame.

Because the defendant cannot be responsible for the actions of Carroll and because there is no other evidence of intentional procurement of Lakeland by the defendant, the claim must fail concerning that customer.

### B. Piedmont Health Group

The defendant also contends that the plaintiff can have no claim concerning its former clients, the Piedmont Health Group entities, because (1) there existed no contract with those entities to be breached; (2) it did not intentionally procure any such alleged breaches; and (3) even if it had, it was justified in doing so.

#### 1. *Existence of a contract*

The defendant first contends that the claim must fail as to PHG because no valid contracts existed between them and the plaintiff, with which the defendant could have ever interfered. Specifically, the defendant contends that the existing contracts were signed by Kim Bradberry, a person, who by her own testimony, was without authority to do so. (Bradberry Dep. at 11, 13-14.) The plaintiff has responded with evidence, creating an issue of fact, as to whether or not Bradberry was mistaken. A coworker, Brian Dean, testified as follows:

> Q. Who signs contracts on behalf of Piedmont Health Group?
> 
> A. Kim Bradberry.

(Dean Dep. at 29.) From this testimony and the presence of six separately executed and written contracts, signed by Bradberry (Pl. Ex. H), a jury might find that she had the authority to consummate the contract and did, in fact, do so.

The defendant further contends that there was a private understanding between the parties that the only purpose of the signed contracts was to satisfy the interests of the FCC, should any audit be made of the plaintiff's records and, further, that the contracts were not intended to be "binding" on PHG. (Bradberry Dep. at 21-22; Moore Dep. at 42-43.) The plaintiff has submitted conflicting deposition testimony of John Lawrence that such was not

12

the latent intent of the parties. (See Pl. Ex. E.) Regardless of the presence of any conflicting testimony, though, the contracts themselves do not profess to be anything other than properly executed and binding on the parties (see Pl. Ex. H) and the plaintiff takes the position, presently, that such was always its intent. At best, therefore, this is a material factual dispute which survives summary judgment. At worst, even were the defendant's evidence ultimately credible as to the secret understanding of the document, as a matter of law, that truth might still prove insufficient to defeat a properly executed written instrument, void of any patent ambiguity. *See Cullen v. McNeal*, 2010 WL 3958708, at *4 (S.C. Ct. App. October 06, 2010 ("However, where a contract is ambiguous, parol evidence is admissible to ascertain the true meaning and intent of the parties.") The Court need not decide it now, however, because no such argument has been raised.

### *2. Knowledge of the contract*

The defendant next contends that it plainly was *un*aware of the contracts with PHG, to whatever extent enforceable. The plaintiff has offered a one sentence response. Specifically, the plaintiff contends that the defendant conceded that it was aware of the "business relationship" between the plaintiff and PHG. (Pl. Resp. at 11 (citing Def. Mem. Supp. Summ. J. at 30 n.28.) This might be enough. In brief, the defendant does appear to implicitly confess knowing that PHG was receiving telecommunications services from the plaintiff at the time the defendant bid for PHG's business. *See id.* The plaintiff has also highlighted the testimony of Lee Canipe, one of the defendant's regional salesmen, in further corroboration of the defendant's awareness. (Canipe Dep. at 25-26.)

In the undersigned's view, however, some knowledge of a "business relationship" is not equivalent to knowledge of a binding contract. The Court is not precisely sure what is required in this regard. It does appear, though, that South Carolina courts have not required much in terms of awareness. *See, e.g., Vortex Sports & Entertainment, Inc. v. Ware*, 662 S.E.2d 444, 449 (S.C. 2008) ("Clearly, as acknowledged by CSMG's emails, it had *some knowledge* that income from Ware's SRAs wou(ld go to the outstanding debt of Vortex." (emphasis added)). Like most states, South Carolina looks to the Restatement

13

(Second) of Torts for guidance concerning the elements of the tort of inference with contract. *See, e.g., Waldrep Brothers Beauty Supply, Inc. v. Wynn Beauty Supply Co.*, 992 F.2d 59, 63 (4th Cir.1993). Comment i to the Restatement indicates that "to be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts, § 766, *comment i*. It seems that the evidence narrowly meets this test. The Court would hesitantly recommend that the plaintiff ought to be able to make its case on this element based on the present evidence.

### 3. *Intentional procurement*

The defendant also contends that there is no evidence of intentional procurement. The plaintiff relies upon the aforementioned testimony of Canipe:

> Q. Well, let's talk about PHG. Whose idea was it for you to be introduced to PHG?
>
> A. Dwayne Moore.
>
> Q. And tell me about how Mr. Moore came up with this idea.
>
> A. As best I remember, he contacted me and said that there was an opportunity at Piedmont Health Group and he wanted to introduce me to the customer and wanted me to pursue a Centrex type phone system quotation for this customer.
>
> Q. Describe for me what he meant by an opportunity?
>
> A. That there was a customer that he wanted me to provide a quotation to.
>
> Q. Did Mr. Moore let you know whether they were pleased or displeased with their current service?
>
> A. Yes, he did.
>
> Q. What did he say?
>
> A. Just that the customer was not pleased with their current provider and they were looking at alternatives.
>
> Q. Who was their current provider?
>
> A. Genesis.

(Canipe Dep. at 25-26). The defendant deflects this testimony as not in any way inconsistent with its own position that PHG initiated contact with it and solicited a bid. The defendant has put forward evidence that PHG decided on its own to look for quotes on telecommunications services as a result of a planned move to a new facility. (Bradberry Dep. at 55-56; Moore Dep. at 39, 41-42.) There is evidence that PHG asked Moore, as its computer consultant, to seek quotes for telecommunications for a new facility, and that he sought quotes from Nuvox, Embarq, and Genesis. (Moore Dep. at 39, 41-42.) The defendant contends that it simply responded by meeting with Kim Bradberry and presenting a quote (Canipe Dep. at 27-28), which she ultimately accepted, *id*. at 43-44.

It is hard to view Canipe's testimony as somehow suggesting otherwise. In fact, the defendant has expressly borrowed from the same in support of its view. But, a reasonable jury might see it differently and believe the plaintiff. Moreover, as far as the Court can tell, PHG's solicitation of a bid is not an absolute affirmative defense. Certainly, if PHG's solicitation evidenced an independent inclination to breach its contract apart from any actions of the defendant, then the plaintiff would have a causation/procurement problem with its claim. But, as the Restatement indicates, "the question whether the actor's conduct caused the third person to break his contract with the other raises an issue of fact" not appropriate at summary judgment. Restatement (Second) of Torts, § 766, *comment o*.

### 4. *Absence of justification*

The defendant further contends that there is no evidence of a lack of justification for the procurement because it necessarily must have involved some improper means or methods, which does not include normal business rivalry or competition. *See Waldrep*, 992 F.2d at 63. The Court respectfully believes that such a requirement is only applicable where the contract is either at-will or otherwise considered prospective in nature.[3] *See*

---

[3] Because an at-will contract includes no promise of future performance, any interference is necessarily treated as imposing on a prospective right. *See Duggin v. Adams,* 360 S.E.2d 832, 836 (Va. 1987); Restatement (Second) of Torts § 766 *comment g*. Interference with such contracts, therefore, have been uniformly considered in the context of a claim for interference with prospective rights as opposed to interference with contract.

*Southern Contracting, Inc. v. H.C. Brown Const. Co., Inc.*, 450 S.E.2d 602, 606 (S.C. Ct. App. 1994); *Crandall Corp. v. Navistar Int'l Transp. Co.*, 395 S.E.2d 179, 180 (S.C. 1990) (finding in case for intentional interference with an at-will contract, "[i]mproper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship."); *see also Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987); Restatement (Second) of Torts § 768.

Although the Court has been unable to find a South Carolina case that has expressly synthesized the law on justification as between cases involving at-will contracts or prospective rights and those involving contracts of a fixed duration, courts of this State have heavily and specifically borrowed from the Virginia state court case, in *Duggin*, cited above. *See Love v. Gamble,* 448 S.E.2d 876, 883 (S.C. Ct. App. 1994); *Crandall*, 395 S.E.2d at 266. *Duggin* makes express, what is understated in South Carolina jurisprudence, that where a contract is terminable at will, or prospective in nature, as opposed to of a fixed duration, the plaintiff must prove "not only an intentional interference that caused the termination of the at-will contract, but also that the defendant employed 'improper methods.'" Duggin, 360 S.E.2d at 836. This pronouncement is consistent with the distinction South Carolina courts have necessarily made in demanding proof of improper purpose or methods only in cases involving at-will contracts. *See Love,* 448 S.E.2d 876, 882-83; *Southern Contracting*, 450 S.E.2d at 605-066 (analyzing claim for both tortious interference with contract and tortious interference with prospective rights and requiring proof of improper motive and purpose only as to the latter).

The Fourth Circuit Court of Appeals decision, in *Waldrep*, relied upon by the defendant, is in keeping with this view. There, the Fourth Circuit's conclusion that a defendant is justified in interfering with a contract as an incident of business competition and rivalry, is carefully, if not expressly, limited to the circumstances of an "at-will contract." *Waldrep*, 992 F.2d at 63. To that end, the court specifically relied upon Section 768 as

16

opposed to 766 of the Restatement (Second), *id.*, which pertains to prospective contractual relations and contracts terminable at will, *see* Restatement (Second) of Torts § 768.

Finally, South Carolina's articulation of tortious interference *with prospective rights* plainly includes, as an element, proof of improper purpose or method. *Crandall*, 395 S.E.2d at 266. All the parties agree that tortious interference with contract includes no such express element. It would be a strange circumstance were the distinctly framed element schemes to demand simply the same proof. The Court assumes the distinction is a material one. The South Carolina Court of Appeals in *Southern Contracting* certainly treated the claims separately in this regard, requiring proof of improper purpose or method as to the tortious interference with prospective rights claim but not the tortious interference with contract one. *Southern Contracting*, 450 S.E.2d at 605-066.

Even still, this is a difficult conclusion – to find as irrelevant to justification the propriety of acts taken. Obviously, the phrase "absence of justification" must be imbued with some meaning. In truth, the Court has found largely unsatisfactory the treatment of the justification element in the cases of South Carolina and this District. The Court does not mean to over-complicate its application, but guidance is thin, as far as the Court can tell and to the extent it has been directed by the parties.

In the least, it appears that the exercise of "an **absolute right**, equal or superior to the right invaded" in the contract breached would justify intentional procurement. *Southern Contracting*, 450 S.E.2d at 605 (emphasis added). Otherwise, the issue of justification is one of fact based on an "analysis of the circumstances," not suitable for resolution on the record here at summary judgment. *Id*.

In this case, the contracts at issue are for a fixed duration, 36 months to be precise. (Pl. Ex. H.) Accordingly, the Court will not demand evidence of improper purpose or method. The only possible justification for the defendant's procurement of PGH was of the most generalized kind – business competition. While this is a serious and guarded right, it is far from an absolute one. Our laws, common and statutory, circumscribe free enterprise in all manner of ways. The defendant had no other specific right, to wit, in a

17

preexisting contract or business relationship, whose enforcement was essential or compelled thereby incidentally procuring breach on a part of PGH.  *See, e.g., Southern Contracting*, 450 S.E.2d at 605 ("Great American had an absolute right under its contract with Brown to command compliance with the subcontractor bonding requirement.") The Court, therefore, recommends that a reasonable jury might be able to conclude that there was an absence of justification for the procurement, if any.

The irony in this conclusion, of course, is that in regards to the client whom the evidence suggests was most predatorily pursued, Lakelands, the plaintiff seems to have no recourse against the defendant, but, here, where the evidence is only marginally capable, the plaintiff will apparently survive.  The whole matter is somewhat tortured and, precisely so, better suited to resolution by jury based on the generous and fulsome presentation which live advocacy and evidence affords.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is RECOMMENDED that defendant Embarq Communications' motion for summary judgment, should be GRANTED in part and DENIED in part.  Specifically, it is RECOMMENDED that the motion be GRANTED as to the plaintiff's claim for tortious interference with contract claim as it relates to all customers at issue in this lawsuit except the six (6) Piedmont Health Group entities.  As to those six prior customers, the claim should survive.

IT IS SO RECOMMENDED.

                                        s/Bruce H. Hendricks
                                        United States Magistrate Judge

October 18, 2010
Greenville, South Carolina

**The parties attention is directed to the important notice on the next page.**